STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

19-207

DAVID MICHAEL CRAIG

VERSUS

SHARI RENEE BISHOP

**********

APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 2017-3744
HONORABLE LILYNN CUTRER, DISTRICT JUDGE

**********

**PHYLLIS M. KEATY**
**JUDGE**

**********

Court composed of John D. Saunders, Phyllis M. Keaty, and Jonathan W. Perry, Judges.

**AFFIRMED.**

**Hillary L. Nixon**
**Law Office of Hillary L. Nixon, LLC**
**1111 Ryan Street**
**Lake Charles, Louisiana 70601**
**(337) 419-5252**
**Counsel for Defendant/Appellant:**
    **Shari Renee Bishop**

**David M. Hudson**
**Larry A. Roach, Inc.**
**2917 Ryan Street**
**Lake Charles, Louisiana 70601**
**(337) 433-8504**
**Counsel for Plaintiff/Appellee:**
    **David Michael Craig**

**KEATY, Judge.**

Defendant appeals the trial court's judgment granting Plaintiff sole custody of the parties' minor child and supervised visitation for Defendant. For the following reasons, the trial court's judgment is affirmed.

## FACTS & PROCEDURAL HISTORY

Defendant, Shari Renee Bishop, married Jerry Cummings on November 10, 1996, and together they produced four children: Israel Cummings, born September 10, 1997; Benjamin Cummings, born June 13, 2000; Eliana Cummings, born February 5, 2004; and Seven Cummings, born May 11, 2007. Those children are no longer in Shari's custody. While still married to Jerry, Shari met David Michael Craig, Plaintiff herein, in 2010. Shari and David began living together, and she became pregnant with his child. Their son, Dexter Craig, was born on November 7, 2011. Shari and Jerry divorced in 2013, and she married David on July 4, 2015, when Dexter was approximately three years old. Shari, David, and Dexter lived together in Calcasieu Parish.

On September 13, 2017, David filed a Petition for Divorce pursuant to La.Civ.Code art. 102, Petition for Ex Parte Child Custody and Civil Warrant, and Petition for Child Custody and Child Support. He alleged Shari suffered from mental health issues including irrational and delusional beliefs that she and her children are being stalked and attacked by "sex offenders, devil worshipers, evil clowns, juggalos,[1] demons, and ghosts." The trial court signed an Ex Parte Custody Order on September 17, 2017 and granted David's request for sole custody. Shari was granted supervised visitation "every other weekend for 2 hours at the Whistle Stop"[2] at her costs. David was given the exclusive use of their home and two

---

[1] Testimony in the record defines "Juggalo" as want-to-be clown people.

[2] The Whistle Stop is a supervised visitation center.

vehicles. The trial court issued a temporary restraining order prohibiting Shari from hiding Dexter or removing him from Calcasieu Parish. Those issues were scheduled for a hearing on October 30, 2017.

On September 28, 2017, Shari filed an Answer to Petition for Divorce and Reconventional Demand. Therein, she requested a divorce pursuant to La.Civ.Code art. 102. Shari alleged that her former husband, Jerry, had filed a petition to disavow Dexter's paternity. According to her, the record was void of a written judgment of disavowal such that it was unknown whether David's paternity of Dexter had been legally established. Shari alleged that David was mentally unstable with a violent criminal history. She requested that Dexter be returned to her or, alternatively, overnight weekend visitation with him at her parents' home and under their supervision. Shari wanted the ex parte order set aside and requested joint custody with her being designated as the domiciliary parent. The trial court issued an Order on October 4, 2017, denying Shari's request to set aside the ex parte order and her request for overnight visitation.

At the hearing on October 30, 2017, an Order for Mental Health Assistance was issued by stipulation of the parties for a psychiatric evaluation of Shari to be performed by Dr. James Anderson. On that same date, the parties stipulated that Shari's interim visitation would be expanded with her parents, Rhonda Bishop and Ronnie Bishop, designated as supervisors.[3] The parties agreed that if those supervisors were unavailable, visitation would occur at the Whistle Stop. The foregoing was reduced to writing in a Stipulated Judgment filed on November 20, 2017. Prior to that judgment, a Supervised Visitation Order and Acceptance was signed by each supervisor and issued by the trial court for each supervisor.

---

[3] The record contains various spellings of Shari's mother. For clarity, we will refer to Shari's mother as "Rhonda."

2

Additionally, a hearing occurred on November 6, 2017, after which a Consent Judgment was issued regarding child support, medical expenses, taxes, and court costs.

On January 5, 2018, Shari filed an Ex Parte Request for Custody Affidavit of Petitioner and alleged that David was abusing Dexter and threatened to kill him. Her ex parte request was denied by the trial court that same day. The remaining issue of whether David should undergo a psychological evaluation was ordered by the trial court to be determined at the upcoming trial. On January 8, 2018, David filed a Motion to Suspend Supervised Visitations Outside of Whistle Stop because of Shari's alleged violation of the pending custody order and temporary restraining order. According to David, Shari and Ronnie removed Dexter from Calcasieu Parish on December 23, 2017 and went to Texas where they secreted him from David. David, with the help of law enforcement, regained custody on December 25, 2017. David sought to remove Ronnie as the visitation supervisor and have all visitation between Shari and Dexter occur at the Whistle Stop. On January 10, 2018, David filed a First Supplemental and Amending Petition naming Jerry as a defendant in his capacity as Dexter's "presumed legal father." On February 22, 2018, David filed a Rule for Contempt against Shari and Ronnie based upon the Christmas incident.

Trial began on February 26, 2018. At issue was David and Shari's request for custody of Dexter, Shari's request for a psychological evaluation of David, and David's request to modify visitation and his contempt rule against Shari and Ronnie. Trial continued on March 14 and 19 and concluded on April 24, 2018, after which the trial court took the matter under advisement. After considering the evidence and the testimony presented at trial, a written judgment along with detailed and thorough written reasons for judgment were rendered on July 13, 2018. The trial court awarded David sole custody of Dexter with Shari given supervised visitation at the

Whistle Stop. It found Shari and Ronnie in contempt and sentenced them to ninety days in jail with said sentences suspended if they complied with all future court orders. Finally, the trial court assessed Shari with all costs of the proceedings. The foregoing judgment was appealed by Shari.

On appeal, Shari contends that:

I.    The trial court erred in finding that the record established by clear and convincing evidence that sole custody to David was in the best interest of Dexter.

II.   The trial court abused its discretion in finding that the testimony of Israel, Ben, and Eliana Cummings provided good insight into Shari's abilities and dispositions to parent based on her history of parenting and in relying on their testimony to determine the best interest of Dexter.

III.  The trial court erred in finding that Louisiana Civil Code art. 134 factors (2), (3), (4), (5), (6), (7), (8), and (10) weigh in favor of David.

**STANDARD OF REVIEW**

An appellate court may not set aside a trial court's findings of fact in absence of manifest error or unless it is clearly wrong. *Stobart v. State*, *through Dep't of Transp. & Dev.*, 617 So.2d 880 (La.1993). This applies in child custody disputes wherein appellate courts accord substantial deference to the trial judge's conclusions. *Deason v. Deason*, 99-1811 (La.App. 3 Cir. 4/5/00), 759 So.2d 219. "'The trial judge is in a better position to evaluate the best interest of a child from his observance of the parties and the witnesses and his decision will not be disturbed on review absent a clear showing of abuse.'" *Id*. at 220 (quoting *State in the Interest of Sylvester*, 525 So.2d 604 (La.App. 3 Cir. 1988)). When findings are based on determinations of the credibility of witnesses, the manifest error/clearly wrong standard of review "demands great deference to the trier of fact's findings; for only the factfinder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said." *Rosell v. ESCO*,

4

549 So.2d 840, 844 (La.1989). "[W]here two permissible views of the evidence exist, the fact-finder's choice cannot be manifestly erroneous or clearly wrong." *D.M.S. v. I.D.S.*, 14-364, p. 19 (La.App. 4 Cir. 3/4/15), 225 So.3d 1127, 1140, *writ denied*, 15-897 (La. 6/19/15), 172 So.3d 654.

## DISCUSSION

### I. First and Third Assignments of Error

In her first assignment of error, Shari contends the trial court erred in finding that it was in Dexter's best interest to award David sole custody. In her third assignment of error, Shari contends the trial court erred in finding that certain factors enunciated in La.Civ.Code art. 134 weighed in David's favor. We will discuss both assignments of error together since they address the same issue, i.e., the best interest of Dexter.

Louisiana Civil Code Article 131 provides that "[i]n a proceeding for divorce or thereafter, the court shall award custody of a child in accordance with the best interest of the child." "It is the child's emotional, physical, material and social well-being and health that are the court's very purpose in child custody cases; the court must protect the child from the real possibility that the parents are engaged in a bitter, vengeful, and highly emotional conflict." *Hodges v. Hodges*, 15-585, p. 3 (La. 11/23/15), 181 So.3d 700, 702. As such, custody cases are to be decided upon their "own particular facts and circumstances," keeping in mind that "the paramount goal is to do what is in the best interest of the minor children." *Hebert v. Blanchard*, 97-550, p. 4 (La.App. 3 Cir. 10/29/97), 702 So.2d 1102, 1105. If the parents agree who is to have custody, the court shall award custody in accordance with their agreement unless the best interest of the child requires a different award. La.Civ.Code art. 132. In the absence of an agreement, or if the agreement is not in the child's best interest, the court shall award custody to the parents jointly; "however, if custody in one

5

parent is shown by clear and convincing evidence to serve the best interest of the child, the court shall award custody to that parent." *Id.* "To prove a matter by clear and convincing evidence means to demonstrate that the existence of a disputed fact is highly probable, that is, much more probable than its nonexistence." *State in the Interest of J., K., & T.*, 582 So.2d 269, 275 (La.App. 1 Cir.), *writ denied*, 583 So.2d 1145 (La.1991).

Louisiana Civil Code Article 134 provides, in pertinent part, "the court shall consider all relevant factors in determining the best interest of the child."[4] The third factor, as amended, addresses the "capacity and disposition of each party to give the child love, affection, and spiritual guidance and to continue the education and rearing of the child." La.Civ.Code art. 134(A)(3). The trial court found this factor weighed in David's favor because Shari failed to educate Dexter and failed to enroll him in school. It noted Shari's intent to homeschool Dexter despite her "horrible track record for homeschooling her children." The trial court's finding was based, in part, on the testimonies from her children with Jerry, i.e., Benjamin, Israel, and Eliana.

Our review of the record reveals testimony from Benjamin, who was seventeen years old at the time of trial. Benjamin revealed that after his parents separated, Shari alleged Jerry was too dangerous for him and his siblings. He explained that Shari hid them from Jerry for about six months, during which time neither he nor his siblings attended school. Benjamin was homeschooled "a little bit" although "[i]t was not enough[.]" He attended public school briefly for two weeks in the second grade. Benjamin returned to public school in the fifth grade although he found it difficult because he was only at a third or fourth grade level.

---

[4] Louisiana Civil Code Article 134 was amended on May 23, 2018. For clarity, we will refer to the La.Civ.Code art. 134 factors, as amended.

Israel, who was approximately twenty years old at the time of trial, testified that he began public school when he was twelve or thirteen years old, which is when he started living with his father. Prior to that time, Israel advised that he was homeschooled by Shari. According to him, Shari's homeschooling was insufficient because she "didn't know any of it" and she "couldn't teach it." Shari's mother, Rhonda, testified that she homeschooled Shari after junior high. According to Rhonda's testimony, Shari never graduated high school nor obtained a G.E.D.

On appeal, Shari contends that David was equally responsible for not enrolling Dexter in school before David was awarded custody. David's testimony reveals that he wanted Dexter in school but was told to wait by Shari because of her belief that Israel contracted Asperger syndrome/autism from vaccinations. David believed Dexter would be vaccinated before school and would attend public school as opposed to homeschool. David never witnessed Shari homeschooling Dexter. During that time, David was employed by Wood Group as a contractor for Marathon Oil which required him to work out of town every other week. David feared that if he brought Dexter to receive his vaccinations and enroll him in school, Shari would leave town with Dexter while David was working away. David testified that since gaining custody, he has enrolled Dexter in school as a kindergartener. David's testimony, along with other testimony in the record, reveals that Dexter likes school.

The fourth factor, as amended, focuses on the "capacity and disposition of each party to provide the child with food, clothing, medical care, and other material needs." La.Civ.Code art. 134(A)(4). The trial court found this factor weighed in David's favor because of his "ability to provide for Dexter." Our review of the record reveals testimonies from David and his mother, Theresa Craig, that David is in the process of opening his own lawn maintenance business. Their testimonies reveal that David's business will enable him to work locally and care for Dexter.

The trial court had serious concerns regarding Shari's failure to provide immunizations and other medical care to Dexter. The trial court's finding is supported by David's testimony that Shari was opposed to vaccines. Eliana, who was approximately fourteen years old at the time of trial, testified that Shari believed in conspiracy theories regarding the government's use of vaccines. Eliana explained that her mother did not want Dexter vaccinated. Israel testified that his mother believed his Asperger syndrome/autism was linked to his vaccinations. David's testimony reveals that since obtaining custody, Dexter has seen a physician and is current on his vaccinations.

In brief, Shari argues that the trial court's finding regarding medical care is unreasonable because she has taken her other children to a doctor. However, Benjamin testified that he went to a doctor and told him things that were not true at the behest of his mother with the promise of being rewarded. He explained: "Well, that was another one of those situations where she told us she would reward us based on how much we said and what we said about devil worshipers or juggalos[.]" Benjamin agreed that Shari used to bribe him and his siblings to make false allegations regarding abuse, kidnappings, and being taken into the woods by a cult.

The fifth factor, as amended, examines the "length of time the child has lived in a stable, adequate environment, and the desirability of maintaining continuity of that environment." La.Civ.Code art. 134(A)(5). The trial court found this factor weighed in David's favor. It noted that Dexter and Shari lived with her parents when the couple initially separated, which Shari disagrees with in her brief on appeal. David's testimony in the record reveals that he and Shari remained living at the marital home prior to the Ex Parte Order although he sometimes slept in a camper in his parents' backyard. Shari further argues in brief that the trial court incorrectly found that Dexter has resided in the same location with David since the Ex Parte

Order.  She explains that Dexter stayed with his grandmother, Theresa Craig, while David was working out of town.  However, allowing Dexter to temporarily stay at his grandmother's house while the father is working out of town equates to living in the same location.

Regardless, there is an abundance of other evidence in the record supporting the trial court's finding in favor of David with respect to the fifth factor, as amended.  This includes Theresa's testimony describing the marital home on the day the Ex Parte Order was granted.  According to her, the house was filthy and "littered everywhere."  Theresa stated that there was chicken poop inside because Shari would let the outdoor chickens run inside while David was away at work.  David testified that when he would return home after working out of town, Shari would rush around to clean the filthy house.  He agreed that Shari allowed chickens to run on Dexter's bed while David was out of town.  Eliana also testified that chickens would run around inside.  David revealed that prior to the Ex Parte Order, the home was horrible, demolished, and looked like it had been hit by a hurricane.  Since the Ex Parte Order, David explained the house is wonderful, and the chickens remain outside.  Pictures in the record reveal the conditions of the house on the day of the Ex Parte Order.

The trial court was concerned with the stability of Dexter's living environment because of Shari's beliefs and inappropriate discussions with her children.  A review of the testimony in the record supports the trial court's findings.  Specifically, Eliana testified that her mother would tell her that Jerry abused Eliana by sticking daggers inside of her.  Eliana remembered Shari accusing Jerry of belonging to a group of devil worshipers and Juggalos.  Eliana recalled the summer of 2017 or before when her mother advised that David was a Satanist.  When asked whether Dexter was around when Shari talked about those things, Eliana responded: "Yeah.  He was in

the back seat of the car. We were usually in the car when she talked about it." Eliana was concerned about Dexter's safety while with Shari because of "the stuff with the devil worshipers and stuff like that, the change in [Dexter's] behavior." Eliana stated that Shari gave her Adderall at night to stay up and help Shari clean. Eliana explained that Shari would sometimes keep Dexter up at night. She testified that since Dexter has been living with David, he is more obedient, calmer, nicer, learning more at school, and making friends. Eliana stated that Dexter no longer hits, which he did when living with Shari.

Benjamin remembered Shari saying things about Jerry sticking a dagger in his sister and how Jerry was a Satanist and part of a Juggalo crew. Benjamin defined a Juggalo as a want-to-be clown people. He recalled Shari telling him that David abused her. Benjamin believed that Shari brainwashed Dexter and recalled her telling Dexter that there were monsters in trees around the house. He explained that Dexter stopped fearing monsters once he began living with David. Benjamin said that since living with David, Dexter has improved, is calmer, and more human. He noted that Dexter is not as violent as he was when living with Shari. Benjamin testified that David's house is calm, happy, and clean. Benjamin is not concerned about Dexter's safety when he is with David. However, Benjamin is concerned for Dexter's well-being if he returns to Shari's custody.

Israel's testimony mirrors his siblings' testimonies with respect to Shari's accusations against Jerry. He advised that Shari accused Jerry of child molestation. Israel testified that Shari told him that he was abused by Jerry. Israel advised that Jerry never beat him. He said that Shari accused Jerry of satanic ritual abuse. Israel recalled an instance in 2017 when Shari told him that Jerry was taking Israel's social security money. Israel later found out this was untrue when he received a statement from the social security office. Israel testified that Shari would give him Adderall

to stay up late with her. Israel said that when Dexter was living with Shari, he never wanted to go to the bathroom alone because Shari was always telling him about people hiding in the bushes and trees. He said that Dexter is no longer scared of the bathroom since living with David. Israel would be concerned if Dexter went back to live with Shari.

Israel recalled being ill after eating at Shari's house. He described his symptoms of blindness, temporary loss of feeling in his arms and leg, migraine, nausea, and vomiting. Israel recalled feeling those symptoms a couple of times after leaving his mother's house and believed they were caused by arsenic. According to Israel, he recently tested positive for arsenic.

Similar to Israel, David also tested positive for arsenic according to his testimony. David's testimony reveals that he became sick in 2015 or 2016 when hair fell out of his head and off the side of his face. He advised that his goatee turned white and his weight decreased from over 200 pounds to 150 pounds. David suspected Shari of poisoning him because of their previous conversations wherein she alleged that Jerry poisoned drinks with arsenic.

Lieutenant Beth McGee of the Calcasieu Parish Sheriff's Office testified that Shari is the person of interest with respect to the arsenic poisoning. Lieutenant McGee discussed an incident when Shari removed Dexter from Calcasieu Parish and brought him to Texas during Christmas. She recalled Shari showing her videos made of Dexter while in Texas wherein he said things about David scaring him. Lieutenant McGee opined Dexter was being coached in the videos because he was "somewhat young to use some of the words he was using."

The record contains testimony about Danny Myers. Eliana described Myers as a rapist and registered sex offender. She revealed that Shari used to hang out with Myers and have him sleep over. According to Eliana, Shari told her that Myers is a

11

person who hurt them in the past. Benjamin testified that Shari identified Myers "as a person who was stalking us and stalking Ellie." He explained that Shari picked Myers's name and picture from a police website. Benjamin testified that Myers stayed in their apartment for two or three days and slept in the same bed with Shari, Eliana, and Seven. David testified that prior to meeting Shari, she was living with Myers because the two were in a relationship.

Michelle Fontenot, a family therapist, also testified at trial. She counseled Benjamin, Israel, Eliana, and Seven. Fontenot advised that Shari told her that the children had been ritualistically abused. Fontenot noted that Eliana revealed that Shari gave her Adderall and alcohol. Fontenot recalled Eliana's concern about Dexter. Fontenot noted that Eliana talked about a guy named Danny [Myers] touching her and something about a ritualistic dagger. Fontenot opined that Jerry never abused his children.

David testified that he currently lives in Lake Charles, is employed, and has his own lawn service company. David stated that when Dexter lived with Shari, he was afraid to go to the bathroom because of monsters. Approximately two weeks after living with David, Dexter stopped having those issues. David testified that Shari always talked about evil clowns, Juggalos, demons, devil worshipers, and people eaters.

Ramona Romain, David's aunt, testified that she was concerned for Dexter when David initially obtained custody because Dexter kept talking about demons. Since being in David's custody, Romain opined that Dexter is doing great. According to her, Dexter listens to David. She also recalled Shari telling her that her ex-husband, Jerry, tried to poison her. David's mother, Theresa, testified that Shari always talked about Juggalos and demonic stuff. Theresa testified that since

the Ex Parte Order, Dexter is more well-behaved. Theresa noted that when David initially obtained temporary custody, Dexter would talk about demons.

Bruce Plauche, a mental health professional who counseled Dexter six times since October 31, 2017, also testified at trial. Plauche explained that Dexter's developmental delays with speech and hand coordination have improved. He revealed that Dexter is a happy kid who likes to play. Plauche advised that he never observed Dexter while he was in Shari's custody. All of the foregoing testimony supports the trial court's finding that factor five, as amended, weighs in David's favor.

The sixth factor, as amended, examines the "permanence, as a family unit, of the existing or proposed custodial home or homes." La.Civ.Code art. 134(A)(6). The trial court noted that since Dexter has resided with David, they have remained in one home. This is supported by the record on review. The seventh factor, as amended, examines the "moral fitness of each party, insofar as it affects the welfare of the child." La.Civ.Code art. 134(A)(7). The trial court noted that testimony regarding the parties' moral fitness was discussed in other areas of its opinion.

The ninth factor, as amended, discusses the "mental and physical health of each party." La.Civ.Code art. 134(A)(9). The trial court found that there was no evidence introduced regarding the parties' physical health that would affect their ability to parent Dexter. The trial court was concerned, however, with the allegations that Shari may have had something to do with the arsenic poisoning. The trial court discussed Shari's use of Adderall. It noted that Shari underwent an evaluation with Dr. James Anderson, a psychiatrist, who testified at trial. According to the trial court, Dr. Anderson diagnosed her with post-traumatic stress disorder, depressive disorder, anxiety disorder, and unspecified attention deficit disorder. After listening to the

evidence and testimony, the trial court found that Shari's actions have negatively affected her children. The record supports the trial court's finding in this regard.

The tenth factor, as amended, addresses the "home, school, and community history of the child." La.Civ.Code art. 134(A)(10). The trial court found that the home, school, and community history had already been discussed throughout its opinion. The eleventh factor, as amended, discusses the "reasonable preference of the child, if the court deems the child to be of sufficient age to express a preference." La.Civ.Code art. 134(A)(11). In this case, the trial court held that Dexter, who was six years old, "did not testify nor was he questioned regarding his preferences through a third party such as a counselor." Thus, the trial court did not consider this as a significant factor in this case.

The twelfth factor, as amended, examines the "willingness and ability of each party to facilitate and encourage a close and continuing relationship between the child and the other party[.]" La.Civ.Code art. 134(A)(12). The trial court found that Shari was unwilling to facilitate a relationship between Dexter and David. On review of the record, David testified that there were multiple occasions where she hid Dexter from him, including an incident in 2017 when Shari took Dexter to Texas in violation of an injunction. Other testimony in the record shows Shari's continued negative talk about David and false allegations against David in Dexter's presence.

After considering the foregoing, the trial court found that granting David custody was in Dexter's best interest. Accordingly, we find that the trial court did not abuse its discretion in finding that David proved by clear and convincing evidence that he was entitled to sole custody of Dexter. The trial court was able to personally observe the parties during trial and make its own findings as to Dexter's best interest. The evidence in the record supports the trial court's granting of sole custody to David.

**III.    Second Assignment of Error**

In her second assignment of error, Shari contends the trial court abused its discretion in finding that the testimonies of Israel, Benjamin, and Eliana provided good insight into Shari's abilities and dispositions to parent based on her history of parenting and in relying on their testimonies to determine the best interest of Dexter.

Our review of the record supports the trial court's reliance on the children's testimonies.  Their testimonies were supported by other witness testimony regarding Shari's behavior as a parent which, in turn, relates to Dexter's best interest.  The children's testimonies related to both their experiences while living with Shari along with their observations of Shari parenting Dexter.  The trial court did not abuse its discretion and this assignment of error is without merit.

## DECREE

For the foregoing reasons, the trial court's judgment is affirmed.

**AFFIRMED.**